## BRAZLETON'S ADM'R v. BRAZLETON et al.

1. MORTGAGE: PRIORITY. On the 20th July, 1857, the defendant executed to his father a mortgage conveying certain property to secure ten notes, then executed, for $2,500 each, which mortgage was recorded February 3d, 1859; on the 10th of April, 1858, he executed another mortgage conveying the same property to one W., to secure $10,000, a balance of sums which he had advanced over and above his share to the firm of B. & W., of which both the mortgagor and mortgagee were members, and this mortgage was filed at noon of the same day of its date. *Held*, that the mortgage last executed and first recorded was entitled to priority over the one first executed and last recorded.

*Appeal from Henry District Court.*

MONDAY, JUNE 20.

ON the 20th of May, 1857, Wm. P. Brazleton (the son) made to plaintiff (the father) a mortgage on the property

known as the "Brazleton House," in Mount Pleasant, to secure four notes of $2,500 each, payable three months from said date. This mortgage was filed for record February 3d, 1859. April 10, 1858, W. P. Brazleton made his bond to the defendant, Whiting, conditioned for the payment of $10,000 due, in equal payments, on the 10th of the same month, in the years 1859, 1860 and 1861. On the same day he made a mortgage on the same property, to secure said $10,000, which was duly filed for record at 12 o'clock, noon, of the day of its date.

Each mortgagee commenced proceedings to foreclose. The two cases were consolidated, and on the final hearing they recovered judgment against the mortgagor, *the priority of lien being awarded to Whiting*, and to reverse this part of the decree, Bereman, as administrator of Samuel Brazleton (the other mortgagee), appeals.

*D. Rorer, A. H. Bereman, L. G. Palmer* and *J. C. & B. J. Hall* for the appellants.

*Clark* and *Doolittle* for the appellee.

WRIGHT, Ch. J.—It will be seen that the Whiting mortgage *is subsequent* in date, but was filed for record *before* that to appellant. This filing, therefore, gives him the prior lien, unless he had notice of the other mortgage, or unless other equities exist, as maintained by appellant, which should give precedence to the mortgage first in date.

The question of fact, did Whiting have actual notice of the prior mortgage? we may dispose of in a few words. Counsel have evidently prepared the case with that care due to its importance to their clients. A great mass of testimony has been taken and yet we have no hesitation in saying that it falls far short of bringing knowledge of appellants' mortgage home to Whiting, at or before the execution and delivery of his. Indeed, we cannot resist

having doubts whether plaintiff's mortgage had been delivered at that time, or had any other than a conditional existence. Nothing can be clearer than that if it had then been delivered, if it then did, in fact, exist as a lien, W. P. Brazleton was either extremely indifferent to plaintiff's rights, or else contemplated a fraud, for the testimony is overwhelming that he, on repeated occasions, and at different places, in the presence of different persons, prior and up to the time of making the second mortgage, represented and stated that there were no liens, no mortgages upon this property; that it was clear and free from all incumbrances, and he intended to keep it so.

Not only so, but after the second mortgage was made, he expressly denied that he had made any mortgage to his father. The father and son, with Moses Beers, were doing a banking business, under the name and style, W. P. Brazleton & Co., prior to the 11th of May, 1857. The whole business was carried on by W. P.—the father and Beers (W. P. Brazleton's father-in-law) lending him their names, and probably some means, to assist him. On that day W. P. and defendant Whiting, formed a partnership in the same business, under the name of Brazleton & Whiting, the father and father-in-law retiring. This mortgage was made, or bears date, a few days afterwards, and was kept in the safe of the new firm in a closed envelope. Brazleton still transacted most of the business, and had the principal control and management of the office property, furniture and keys; and the probabilities are that either because he was actually owing his father, and that he ought to secure him, or that he knew that his business was not in the most secure condition, and that by making this incumbrance he might, through his father, save something from the wreck, we say the probabilities are, that from some such motives he made this mortgage, and awaited its delivery for months and months, and until it was too

late to accomplish its purpose, whether good or bad.   The
testimony shows that it was in the safe and under his con-
trol, rather than the father's, long after it bears date.   Then
if actually delivered, when executed, and intended to secure
a *bona fide* debt, it is most extraordinary that it should have
remained unknown to the parties, and unrecorded, for nearly
two years.   It is certainly very unusual that in a matter
of this magnitude a creditor should be so careless of his
interest, even while reposing the utmost confidence in
his debtor.   But whatever may be the true state of the
transaction between father and son, there is no sufficient
evidence that appellee had any knowledge of the mortgage.
It is true that W. P. swears that he so advised him at the
time of making the second one, but in this he is contra-
dicted by Whiting and all the other testimony and circum-
stances.   Not only so, but he swears that he told Whiting
at the same time that it was not on record, nor did he intend
that it should be, thus giving, by his testimony, some color
to the probable truth of the transaction, as above sug-
gested.

But one of the counsel, at least, for the appellant, relies
upon this view of the case: Samuel Brazleton's mortgage,
he insists, was made to secure the *individual* debt of the son,
while the one to Whiting was in trust to secure the creditors
of Brazleton & Whiting, which mortgage he (Whiting) was
to use to raise funds to pay such debts, or indemnify him
for paying them.   And connected with this statement he
maintains, that as between a precedent unrecorded mort-
gage and an assignment for creditors, the mortgage has
priority; that it is the *nature* of the debt, and not the
recording that gives the first (unrecorded) mortgage priority.
Other counsel again maintain substantially the same ground,
insisting also that the mortgage to Whiting belongs to the
firm, and was made to enable Whiting to pay the debts of
the firm; that notice to Brazleton, one of the firm, was

notice to both or all; that it was given to pay or secure a precedent debt; and that, therefore, the question of notice is of no moment, for that Whiting is not in the attitude of an innocent purchaser or mortgagee; that it is without consideration, for that Whiting, on receiving it, only agreed to pay his own debts, which he was bound to pay anyhow; and that if the firm is insolvent, and any one should have preference, it should be a stranger rather than one of the firm. And in these and kindred propositions, variously stated and much elaborated, will be found the points principally relied upon for the reversal of the case.

Some of these are of doubtful tenability, others are clearly erroneous, while all of them mistake the actual facts of the case, so far as the rights of Whiting are concerned. This mortgage was made to secure Whiting for advances actually made, over and above his due proportion, for the firm of Brazleton & Whiting. In other words, it was made to secure him in the amount admitted to be due him from Brazleton. He never assumed to *pay* their debts. He undertook, it is true, to actively engage himself in settling and closing up the affairs of the firm. But the mortgage had nothing to do with the settlement with creditors. To pay the old depositors and debts of Brazleton & Co., Brazleton had drawn from the new firm large sums of money, and thus had become largely his debtor. In consequence of this, the new firm, after being in business about eleven months, was compelled to close its affairs. Whiting had advanced largely while Brazleton had drawn largely and advanced but little. Ascertaining this, Whiting took this security for $10,000 of the amount, agreeing to extend the time of payment one, two and three years, and in this extension, if in nothing else, there was a consideration for the security. True, there was a separate instrument executed at the same time, which authorized Brazleton to negotiate the mortgage. But the explanation for this is

found in the fact that the *notes drew but ten per cent*, while Brazleton agreed by a separate contract that as long *Whiting held* the mortgage he would pay fifteen. Hence, Brazleton reserved the right to himself to bring about a negotiation, raise the money, pay Whiting, and reduce the interest. But for this, Whiting might, in order to continue the fifteen per cent interest, have retained the notes and mortgage without an effort to negotiate them.

The mortgage was not given to secure firm creditors. Whiting is not a trustee. It was not made either legally or equitably to the firm. Whiting, as to this transaction, stands like any third person securing a debt due him individually, and, as a consequence, the positions taken and authorities cited by counsel are inapplicable and need not be further examined.

Affirmed.